No. 24-6043

## United States Court of Appeals
## for the Sixth Circuit

DAN McCALEB,

*Plaintiff-Appellant,*

v.

MICHELLE LONG, in her official capacity
as Director of the Tennessee
Administrative Office of the Courts,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Middle District of Tennessee
No. 3:22-cv-00439 - Hon. Eli Richardson

## APPELLANT'S BRIEF

Jacob Huebert
James McQuaid
LIBERTY JUSTICE CENTER
7500 Rialto Blvd., Suite 1-250
Austin, Texas 78735
Telephone: (512) 481-4400
jhuebert@ljc.org
jmcquaid@ljc.org

*Counsel for Appellant Dan McCaleb*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1(a) and 6th Cir. R. 26.1, Plaintiff-Appellant Dan McCaleb makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? No.


Dated: March 13, 2025
/s/ Jacob Huebert
Jacob Huebert
LIBERTY JUSTICE CENTER
7500 Rialto Blvd., Suite 1-250
Austin, Texas 78735
Telephone: (512) 481-4400
jhuebert@ljc.org
jmcquaid@ljc.org

*Counsel for Appellant Dan McCaleb*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................... ii

TABLE OF AUTHORITIES .................................................................v

REQUEST FOR ORAL ARGUMENT......................................................1

JURISDICTIONAL STATEMENT ........................................................2

ISSUES FOR REVIEW........................................................................3

STATEMENT OF THE CASE ...............................................................4

      A. Tennessee's Judicial Advisory Commission ...............................4

      B. Closure of the Judicial Advisory Commission's Meetings ..........5

      C. Plaintiff Dan McCaleb.................................................................6

      D. Procedural History .....................................................................7

STANDARD OF REVIEW ...................................................................9

SUMMARY OF THE ARGUMENT .......................................................9

ARGUMENT.....................................................................................13

    I.      The *Richmond Newspapers* test applies to Plaintiff's
            First Amendment claim seeking access to meetings of
            Tennessee's Judicial Advisory Commission. ........................13

    II.     Under the *Richmond Newspapers* "experience and
            logic" test, Plaintiff has a First Amendment right to
            access meetings of Tennessee's Judicial Advisory
            Commission........................................................................24

A.  Tennessee Judicial Advisory Commission meetings satisfy the "experience" prong because there is a tradition of accessibility for this and similar proceedings. ....................................................................25

B.  Tennessee Judicial Advisory Commission meetings satisfy the "logic" prong because public access plays a significant positive role in the Commission's functioning........................................................................29

C.  The government cannot satisfy its burden under strict scrutiny. ..................................................................31

CONCLUSION.........................................................................35

CERTIFICATE OF COMPLIANCE .......................................36

CERTIFICATE OF SERVICE ...............................................37

ADDENDUM ..........................................................................38

# TABLE OF AUTHORITIES

## Cases

*Bridges v. California*,
  314 U.S. 252 (1941) ...............................................................17

*Brown & Williamson Tobacco Corp. v. FTC*,
  710 F.3d 1165 (6th Cir. 1983) ...........................................20

*Bush v. Rauch*,
  28 F.3d 842 (6th Cir. 1994) ................................................. 9

*Cal-Almond, Inc. v. USDA*,
  960 F.2d 105 (9th Cir. 1992) ...............................................20

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .............................................................. 9

*Detroit Free Press v. Ashcroft*,
  303 F.3d 682 (6th Cir. 2002) .......................................passim

*First Nat'l Bank of Bos. v. Bellotti*,
  435 U.S. 765 (1978) ...............................................................16

*Fusaro v. Cogan*,
  930 F.3d 241 (4th Cir. 2019) ................................................18

*Globe Newspaper Co. v. Superior Court*,
  457 U.S. 596 (1982) .......................................................30, 31

*Houchins v. KQED, Inc.*,
  438 U.S. 1 (1978) ..........................................................passim

*Indianapolis Star v. United States*,
  692 F.3d 424 (6th Cir. 2012) .........................................10, 17

*Larson v. Domestic and Foreign Commerce Corp.*,
  337 U.S. 682 (1949) ............................................................... 2

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) .............................................................. 9

*N.J. Media Grp. v. Ashcroft*,
  308 F.3d 198 (3d Cir. 2002)..................................................20

*Phillips v. DeWine*,
  841 F.3d 405 (6th Cir. 2016) ..............................11, 21, 22, 23

*Press-Enterprise Co. v. Superior Court of Cal.*,
  464 U.S. 501 (1984) ..............................................................31

*Press-Enterprise Co. v. Superior Court*,
  478 U.S. 1 (1986) ..................................................................17

*Richmond Newspapers v. Virginia*,
  448 U.S. 555 (1980) ....................................................... passim

*Salmi v. Sec'y of Health & Human Servs.*,
  774 F.2d 685 (6th Cir. 1985) .................................................21

*United States v. Miami Univ.*,
  294 F.3d 797 (6th Cir. 2002) .................................................19

*Whiteland Woods, L.P. v. West Whiteland*,
  193 F.3d 177 (3d Cir. 1999)...................................................20

**Statutes**

28 U.S.C. § 1331.................................................................... 2

28 U.S.C. § 2073....................................................................26

**Other Authorities**

*In re Advisory Commission on the Rules of Practice and Procedure*, No.
  ADM 2022-00001 (Tenn. 2022) ............................................ 4

Matthew Schafer, *Does* Houchins v. KQED, Inc. *Matter?*, 70 Buffalo L.
  Rev. 1331 (2022).........................................................16, 22

*Media Right of Access*, 92 Harv. L. Rev. 174 (1978) ...............15

Peter G. McCabe, *Renewal of the Federal Rulemaking Process*, 44 Am.
  U. L. Rev. 1655 (1995)...........................................................28

*The First Amendment Right to Gather State-Held Information*, 89 Yale
  L.J. 923 (1980)......................................................................16

U.S. Courts, *Procedures Governing the Rulemaking Process* § 440.20.30
  ...............................................................................27, 28

United States Courts, *How the Rulemaking Process Works* ......26, 27, 29

United States Courts, *Open Meetings and Hearings of the Rules
  Committee*.............................................................................27

United States Courts, *Overview for the Bench, Bar, and Public*............27

William Bennett Turner, *Chief Justice Roberts' Surprising Views on the Public's Right to Know*, Bloomberg Law (Feb. 19, 2020) ....................15

**Rules**

Fed. R. App. P. 4 ................................................................................. 2

Fed. R. Civ. P. 56 ............................................................................... 9

## REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellant Dan McCaleb respectfully requests oral argument because this case presents important constitutional questions, including which test courts must apply when a plaintiff alleges a First Amendment right of access to government proceedings like the Tennessee Advisory Commission meetings at issue in this case—a question on which circuits are split, and on which the district court concluded this Court has issued conflicting decisions. Oral argument would assist the Court in placing this case in proper context among authorities analyzing the public's First Amendment right of access to governmental proceedings and information.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because the claim presents a federal question arising under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983. The district court also had jurisdiction under 28 U.S.C. §§ 2201, 2202.

On November 20, 2024, the district court issued an opinion granting Defendant-Appellee's motion for summary judgment and denying Plaintiff-Appellant's summary judgment motion. Memorandum Opinion, R. 88, Page ID ## 2975-89. On the same day, the district court entered judgment in a separate document based on its findings and application of law. Judgment, R. 90, Page ID # 2991.

On November 20, 2024, Plaintiff-Appellant filed his appeal to this Court. Notice of Appeal, R. 91, Page ID # 2992.

This Court has jurisdiction over the appeal under 28 U.S.C. § 1291 because the district court's Judgment was a final decision. *See also* Fed. R. App. P. 4(a)(1)(A).

## ISSUES FOR REVIEW

1. In determining whether the public has a right to access meetings of the Tennessee Judicial Advisory Commission, must a court apply the "experience and logic" test prescribed by *Richmond Newspapers Inc. v. Virginia*, 448 U.S. 555 (1980) and *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002)?

2. Does Plaintiff Dan McCaleb have a First Amendment right to access meetings of the Tennessee Judicial Advisory Commission?

## STATEMENT OF THE CASE

This case is about whether the First Amendment protects a right of the public and journalists such as Plaintiff-Appellant Dan McCaleb to access meetings of the Tennessee Judicial Advisory Commission.

### A. Tennessee's Judicial Advisory Commission

The Tennessee General Assembly established the Judicial Advisory Commission—a body whose members are appointed by the Tennessee Supreme Court, whose duty is to "advise the supreme court from time to time respecting the rules of practice and procedure." Tenn. Code Ann. § 16-3-601, et. seq. The Advisory Commission is a "bench-bar" state court rulemaking group, which means some members are judges, and some are attorneys. Long Deposition, R. 74-2 at Page ID # 2715.

The Tennessee Supreme Court appoints members of the Advisory Commission through court orders filed with the Clerk of the Appellate Courts. For example, in December 2022, the court issued a per curiam order reappointing five members and appointing three new members. Second Notice of Supplemental Authority, R. 38, Page ID ## 1069-87; *see In re Advisory Commission on the Rules of Practice and Procedure*, No. ADM 2022-00001 (Tenn. 2022).

**B. Closure of the Judicial Advisory Commission's Meetings**

Before 2018, Advisory Commission meetings were open to the public. They have been closed, however, since a 2018 incident in which a member of the public was verbally (but not physically) disruptive during one of the Commission's meetings. Michelle Consiglio-Young Deposition, R. 74-3, Page ID ## 2745-46. The record is unclear as to whether the order to close the meetings came from the Tennessee Supreme Court or the Tennessee Administrative Office of the Courts. *See id.* at Page ID ## 2746-47. Regardless, the current Director of the Administrative Office of the Courts, Defendant-Appellee Michelle Long, continues to keep the meetings closed. Long Deposition, R.74-2, Page ID # 2704.

The Advisory Commission's meetings were temporarily reopened to the media and the public under a preliminary injunction that the district court entered in this case. Order and Preliminary Injunction, R. 40, Page ID ## 1102-04. Two meetings held in 2023, in June and December, were available for the public to attend virtually, and video of the meetings remains online. Def.'s Responses to Plf.'s Statement of

Material Facts, R. 81, Page ID # 2848.[1] The Administrative Office of the

Courts posted a public notice of each meeting in advance.[2]

## C. Plaintiff Dan McCaleb

Plaintiff-Appellant Dan McCaleb is an experienced journalist and

Executive Editor of The Center Square, an online news organization

that focuses on local government news and publishes "in the

neighborhood of 70 stories a day." McCaleb Deposition, R. 74-1, Page ID

## 2659, 2662.

As an experienced journalist, McCaleb believes in open government.

McCaleb Deposition, R. 74-1 at Page ID # 2659. When he learned that

Tennessee Advisory Commission court rulemaking meetings were

---

[1] *See Advisory Commission the Rules of Practice & Procedure*, YouTube (June 9, 2023), https://www.youtube.com/watch?v=TCCkGHybsxg (last visited Mar. 13, 2025); *December Rules Commission Meeting*, YouTube (Dec. 8, 2023), https://www.youtube.com/watch?v=XHY3DFF3V2E (last visited Mar. 13, 2025).

[2] *See* Advisory Commission on the Rules of Practice & Procedure, https://www.tncourts.gov/calendar/public-meeting-notices/2023/06/09/advisory-commission-rules-practice-procedure (last visited Mar. 13, 2025); Advisory Commission on the Rules of Practice & Procedure, https://www.tncourts.gov/calendar/public-meeting-notices/2023/12/08/advisory-commission-rules-practice-and-procedure (last visited Mar. 13, 2025).

closed to the public and press, he wondered, "[W]hat are they hiding?"
*Id.* at Page ID # 2659. If Advisory Commission meetings were open to
the public, McCaleb would assign reporters from The Center Square to
report on them. *Id.* at Page ID # 2668.

## D. Procedural History

On June 13, 2022, McCaleb filed a Complaint for Declaratory and
Injunctive Relief against Defendant-Appellee Michelle Long in her
official capacity as Director of the Tennessee Administrative Office of
the Courts. Complaint, R. 1, Page ID ## 1-18. McCaleb then amended
his Complaint on June 30, 2022. First Amended Complaint, R. 19, Page
ID ## 131-51. McCaleb's lawsuit alleges that Long's exclusion of the
public from Tennessee Advisory Commission meeting violates his First
Amendment right to free speech. *Id.*

McCaleb sought a preliminary injunction to gain access to
Commission meetings while his case was pending, and Long moved to
dismiss. Motion for Preliminary Injunction, R. 20, Page ID ## 152-157;
Motion to Dismiss, R. 24, Page ID ## 221-223; Memo. in Support of
Motion to Dismiss, R. 25, Page ID ## 224-237. On March 22, 2023, the
district court partially granted McCaleb's motion for preliminary

injunction and denied Long's motion to dismiss. Memorandum Opinion, R. 39, Page ID ## 1088-1104. In its Preliminary Injunction, the district court enjoined Long and all parties acting in concert with her from holding Advisory Commission meetings "without providing the public with access either via livestreaming or in-person attendance." Order and Preliminary Injunction, R. 40, Page ID # 1103.

The parties filed cross-motions for summary judgment. Long Summary Judgment Motion, R. 71, Page ID ## 1929-31; Long Summary Judgment Memorandum, R. 72, Page ID ## 1932-2644; Long Rule 56.01 Statement, R. 73, Page ID ## 2645-50; McCaleb Summary Judgment Motion, R. 74, Page ID ## 2651-2776; McCaleb Rule 56.01 Statement, R. 75, Page ID ## 2777-81; McCaleb Summary Judgment Memorandum, R. 76, Page ID ## 2782-2812.

On November 20, 2024, the district court issued an opinion granting Long's motion for summary judgment and denying McCaleb's motion— departing from the view of the merits it had expressed in its order granting a preliminary injunction. Memorandum Opinion, R. 88, Page ID ## 2975-89. That same day, McCaleb filed a notice of appeal to this Court. Notice of Appeal, R. 91, Page ID # 2992.

## STANDARD OF REVIEW

Appellate courts review a trial court's grant of summary judgment de novo. *Bush v. Rauch*, 28 F.3d 842, 846 (6th Cir. 1994). The moving party bears the burden of showing that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(a). Courts must analyze the evidence submitted in the light most favorable to the nonmoving party and make all reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## SUMMARY OF THE ARGUMENT

The district court erred in declining to apply the test for claims asserting a First Amendment right to access government proceedings prescribed by *Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980); by concluding that McCaleb's claim is foreclosed by *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978); and by concluding that McCaleb has no First Amendment right to access Tennessee Judicial Advisory Commission meetings.

In *Houchins*, a three-justice plurality and single-justice concurrence expressed the view that the First and Fourteenth Amendments provide

no public right of access to government information. *Houchins*, 438 U.S. at 15-16; *id.* at 16-18 (Stewart, J., concurring in the judgment). But that case was brought under the First Amendment's Press Clause, not the Speech Clause, and concerned only whether the press has a *special* right to access information not available to the general public.

In *Richmond Newspapers*, the Court held that the First Amendment *does* protect the public's right to access certain government proceedings—specifically, criminal trials—to prevent arbitrary restriction of the information about which the public may speak. 448 U.S. at 575-78. From *Richmond Newspapers*, courts have derived an "experience and logic" test to determine whether the First Amendment protects public access to a particular proceeding. That test considers (1) whether "the proceeding 'has historically been open to the press and the general public'" and (2) whether "'public access plays a significant positive role in the functioning of the particular process in question.'" *Indianapolis Star v. United States*, 692 F.3d 424, 429 (6th Cir. 2012).

This Court held that this is a test of "general applicability"—not limited to criminal court proceedings—when it upheld a First Amendment right to access deportation proceedings in *Detroit Free*

*Press v. Ashcroft*, 303 F.3d 682, 694 (6th Cir. 2002).

Nonetheless, the district court did not apply the *Richmond Newspapers* test in this case because it erroneously concluded that this Court overruled *Detroit Free Press* in an "en banc" decision, *Phillips v. DeWine*, 841 F.3d 405 (6th Cir. 2016). In fact, *Phillips* was not an en banc decision, could not have overruled *Detroit Free Press*, and does not support the refusal to apply *Richmond Newspapers* here. *Phillips* concluded that *Houchins* forecloses First Amendment claims seeking access to *information*—as distinct from First Amendment claims seeking access to government proceedings, which are governed by *Richmond Newspapers* and *Detroit Free Press*. 841 F.3d at 418-19.

Thus, the district court erred in failing to apply the *Richmond Newspapers* test and in rejecting McCaleb's claim on that basis.

Under the *Richmond Newspapers* test, McCaleb prevails.

McCaleb satisfies the "experience" prong because proceedings like those of the Advisory Commission have historically been open to the public—both in Tennessee, until sometime in 2018, and at the federal level, where meetings of the analogous federal Judicial Conference Committee on Rules of Practice and Procedure and its five Advisory

Committees have been open to the public for nearly 37 years.

McCaleb also satisfies the "logic" prong because public access plays a significant positive role in the Commission's functioning—e.g., by encouraging members to perform their jobs well, allowing the public to promptly address errors, facilitating citizen participation in government, and increasing public confidence in the Commission and the judicial system.

Because these factors establish a First Amendment right of access, the government may exclude the public only if it satisfies strict scrutiny, which it cannot. The government has suggested two purposes public exclusion serves: increasing Commission members' candor and preventing disruptions. Even if those are compelling interests, complete exclusion of the public is not a narrowly tailored means of serving them. The government has not substantiated any effect on candor, but Defendant Long has stated that closure is necessary for candor only at certain times—meaning that the government could serve its interest by closing Commission meetings at *those* times rather than *all the time*. And the Commission can serve its interest in preventing disruptions by giving the public access virtually, as it did when the preliminary

injunction in this case ordered the meetings to be opened.

Because McCaleb has a First Amendment right to access
Commission meetings, and the government has failed to justify its
infringement, this Court should reverse the district court and remand
this case with instructions to enter a permanent injunction directing
Long to give the public access to Commission meetings.

## ARGUMENT

### I. The *Richmond Newspapers* test applies to Plaintiff's First Amendment claim seeking access to meetings of Tennessee's Judicial Advisory Commission.

The district court recognized that this case largely turns on which
Supreme Court precedent provides the appropriate framework for
analyzing Plaintiff Dan McCaleb's First Amendment claim seeking
access to meetings of Tennessee's Judicial Advisory Commission:
*Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980) (together with
its progeny), or *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978).
Memorandum Opinion, R. 88, Page ID # 2982-83. But the district court
erred in concluding that *Houchins* provides the right test. *Id.* at Page ID
# 2985-87. As this Court has recognized, courts must apply *Richmond
Newspapers* to determine whether the First Amendment provides a

13

right of access to government proceedings.

*Houchins* is not a case about public access to government proceedings. In that case, a media organization argued that the Press Clause of the First Amendment gave it a "special right of access to government-controlled sources of information" that entitled it to access a portion of a local jail to take photographs and interview prisoners about conditions there. 438 U.S. at 7-8. A three-justice plurality opinion rejected that argument, concluding that "the media [had] no special right of access to the [jail] different from or greater than that accorded the public generally." *Id.* at 16.

In reaching that conclusion, the *Houchins* plurality appeared to sweep broadly in stating that "[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control." *Id.* at 15. A concurring opinion by Justice Stewart similarly stated that "[t]he First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by the government"—though he also stated that the media organization "was clearly entitled to some form of preliminary injunctive relief" to give the

press "*effective* access to the same areas" that the public could access. *Id.* at 16-17 (Stewart, J., concurring). Three justices dissented, while two others did not participate. *Id.* at 19-40 (Stevens, J., dissenting).

Soon after the Court decided *Houchins*, a *Harvard Law Review* comment observed that the case should not be read as holding that there is *never* a First Amendment right to access *any* government information: "General pronouncements in the opinion that seem to deny *any* public right clearly should be read in context as denying anyone *special rights*, since only this latter issue was argued and analyzed, and the district court's order granted injunctive relief only to representatives of the media." *Media Right of Access*, 92 Harv. L. Rev. 174, 183-84 (1978) (emphasis added). Though the comment was unsigned, it is now known that its author was future Chief Justice John Roberts. *See* William Bennett Turner, *Chief Justice Roberts' Surprising Views on the Public's Right to Know*, Bloomberg Law (Feb. 19, 2020).[3] A comment in the Yale Law Journal took the same view, *The First Amendment Right to Gather State-Held Information*, 89 Yale L.J. 923,

---

[3] https://news.bloomberglaw.com/us-law-week/insight-chief-justice-roberts-surprising-views-on-the-publics-right-to-know.

933 n.50 (1980) (describing the broad statements of *Houchins* as "conclusory dicta"), as has more recent scholarship, *see* Matthew Schafer, *Does* Houchins v. KQED, Inc. *Matter?*, 70 Buffalo L. Rev. 1331, 1435-39 (2022).

Two years after *Houchins*, the Court would show Roberts to be correct, holding in *Richmond Newspapers* that the First Amendment sometimes requires public and media access to government proceedings—specifically, in that case, to criminal trials. Without making any reference to *Houchins*, the Court recognized that the "'[t]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw.'" 448 U.S. at 575-76 (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978)). This "means in the context of trials . . . that the First Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing courtroom doors which had long been open to the public at the time that Amendment was adopted"— "'[f]or the First Amendment . . . must be taken as a command of the broadest scope that explicit language, read the in context of a liberty-

loving society, will allow.'" *Id.* at 576 (quoting *Bridges v. California*, 314 U.S. 252, 263 (1941)). The Court recognized that "[t]he explicit, guaranteed rights to speak and to publish what takes place at a trial would lose much meaning if access to observe the trial could . . . be foreclosed arbitrarily." *Id.* at 576-77.

In reaching that conclusion, the Court emphasized that criminal trials had historically been open to the public, and that the public's "presence historically has been thought to enhance the integrity and quality of what takes place." *Id.* at 569-73, 578.

Thus, courts applying *Richmond Newspapers* have concluded that it prescribes an "experience and logic" test to determine whether the First Amendment protects a right to access a particular government proceeding. That test considers (1) whether "the proceeding 'has historically been open to the press and the general public'" and (2) whether "'public access plays a significant positive role in the functioning of the particular process in question.'" *Indianapolis Star v. United States*, 692 F.3d 424, 429 (6th Cir. 2012) (quoting *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986)).

Some courts have held that the *Richmond Newspapers* test applies

17

generally in cases where plaintiffs seek access to government proceedings and information. Some others, however, have construed the *Richmond Newspapers* test as a "narrow exception" to *Houchins*'s supposed general rule that the First Amendment gives the public no right to access government information. *See, e.g., Fusaro v. Cogan*, 930 F.3d 241, 250 (4th Cir. 2019).

This Court is among those that have concluded that *Richmond Newspapers* generally applies, at least with respect to government proceedings. In *Detroit Free Press v. Ashcroft*, where newspapers asserted a First Amendment right to access deportation hearings, the Court rejected the government's view that "*Houchins* is the applicable standard for reviewing First Amendment claims of access to administrative proceedings." 303 F.3d 682, 694 (6th Cir. 2002).

The Court emphasized that *Houchins* considered whether the Press Clause gives the media "have a constitutional right of access to a county jail, *over and above that of other persons*." *Id.* (quoting *Houchins*, 438 U.S. at 3). The Court distinguished the case before it by noting that the plaintiffs brought their claim under the Speech Clause, not the Press Clause, and did "not claim a 'special privilege of access' to deportation

hearings" but instead sought "to attend the hearings on an equal footing with the public." *Id.*

The Court also observed that the *Houchins* plurality's statement that "the First and Fourteenth Amendment do not guarantee the public a right of access to information generated or controlled by the government was neither accepted nor rejected by a majority of the Court." *Id.* at 694 (citing *Richmond Newspapers*, 448 U.S. at 583 (Stevens, J., concurring)). And the Court recognized that *Richmond Newspapers* and cases applying its "experience and logic" test showed that the Court had "moved away" from the *Houchins* plurality's view and "recognize[d] that there is a limited constitutional right to some government information." *Id.* at 695.

The Court stated that this right includes access not only to criminal trials, as in *Richmond Newspapers*, but also "to certain aspects of the executive and legislative branches," citing examples "outside the criminal judicial context" from this Circuit and others. *Id.* (citing, inter alia, *United States v. Miami Univ.*, 294 F.3d 797, 824 (6th Cir. 2002) (university's student disciplinary board proceedings); *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.3d 1165, 1177-79 (6th Cir.

1983) (civil action against administrative agency); *Whiteland Woods, L.P. v. West Whiteland*, 193 F.3d 177, 181 (3d Cir. 1999) (municipal planning meeting); *Cal-Almond, Inc. v. USDA*, 960 F.2d 105, 109 (9th Cir. 1992) (voter lists)); *see also N.J. Media Grp. v. Ashcroft*, 308 F.3d 198, 208-09 (3d Cir. 2002) (agreeing that "*Richmond Newspapers* is a test broadly applicable to issues of access to government proceedings."). Thus, the Court concluded that, "[w]hile the Government is free to argue that the particular historical and structural features of certain administrative proceedings do not satisfy the *Richmond Newspapers* two-part test, . . . there [was] no basis to argue that the test itself [did] not apply." *Id.* at 696.

Nonetheless, in considering McCaleb's First Amendment claim in this case, which seeks access to proceedings of the Tennessee Judicial Advisory Commission under the Speech Clause, the district court declined to apply the *Richmond Newspapers* test and instead held that *Houchins* controls and forecloses relief. This was the result of a flagrant error: the district court incorrectly stated that this Court rejected the *Richmond Newspapers* approach that it adopted in *Detroit Free Press* in a later "en banc" decision, *Phillips v. DeWine*, 841 F.3d 405 (6th Cir.

2016). Memorandum Opinion, R. 88, Page ID # 2985. In fact, *Phillips*
was *not* an en banc decision and therefore could not have overruled
*Detroit Free Press*, which thus remains binding precedent. *See Salmi v.
Sec'y of Health & Human Servs.*, 774 F.2d 685, 690 (6th Cir. 1985) ("A
panel of this Court cannot overrule the decision of another panel,"
which "remains controlling unless an inconsistent decision of the United
States Supreme Court requires modification of the decision or this
Court sitting en banc overrules the prior decision."). Thus, the district
court's decision is fatally flawed because it rested on a false premise.

As it was not an en banc decision, *Phillips* did not purport to overrule
*Detroit Free Press*. Rather, *Phillips* distinguished *Detroit Free Press* and
concluded that *Houchins* provides the "general rule" for plaintiffs
seeking a First Amendment right to access government *information* as
distinct from government *proceedings*.

In *Phillips*, the plaintiffs brought a First Amendment claim seeking
access to information about the identities of individuals and entities
that participate in the lethal-injection process, which a state statute
shielded from disclosure. 841 F.3d at 410-12. Rejecting that claim, the
Court stated that *Houchins* "sets the baseline principle for First

21

Amendment claims seeking *access to information held by the government*," citing the *Houchins* plurality's statements that "'[t]he Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act,'" and that the First and Fourteenth Amendments do not "mandate[] a right of access to government of information or sources of information within the government's control.'" *Id.* at 418 (quoting *Houchins*, 438 U.S. at 14-15) (emphasis added).[4]

*Phillips* distinguished the *Richmond Newspapers* line of cases by noting that they concern access to government *proceedings* and certain documents filed in those proceedings. *Id.* at 419. *Phillips* concluded that the plaintiffs in that case had no First Amendment right of access to the information they sought because it was "neither information of the type filed in a government proceeding nor its functional equivalent." *Id.*

---

[4] McCaleb maintains that the *Richmond Newspapers* test should completely supplant *Houchins* for First Amendment claims seeking access to government proceedings *or* information. *See Detroit Free Press*, 303 F.3d at 694-95 (questioning the "vitality" of *Houchins*, given that the *Richmond Newspapers* test "sufficiently addresses all of the *Houchins* Court's concerns for the implications of a constitutionally mandated general right of access to government information"); *see generally* Schafer, *supra*. That is not the current law of this Circuit, however, so McCaleb notes this here to preserve the issue for potential consideration by the en banc Court or the Supreme Court.

*Phillips* did not overrule, and could not have overruled, *Detroit Free Press*'s conclusion that *Richmond Newspapers* and its progeny "provide a test of general applicability for making th[e] determination" of whether the First Amendment provides a right to access particular government proceedings. *Detroit Free Press*, 303 F.3d at 699.

To the extent *Phillips* might be read as rejecting or limiting *Detroit Free Press*'s holding on the general applicability of *Richmond Newspapers*, it is incorrect, and its statements should be considered dicta. *Phillips* stated that *Detroit Free Press* "hedged on *Houchins*, finding that it may still be good law but that it did not apply to 'quasi-judicial government administrative proceeding[s].'" *Phillips*, 841 F.3d at 418 (quoting *Detroit Free Press*, 303 F.3d at 696). But *Detroit Free Press* simply stated that, even if *Houchins* "may be applicable to administrative proceedings"—a premise the *Detroit Free Press* decision expressly *rejected*, 303 F.3d at 694 ("We do not agree that the standard articulated in *Houchins* is the applicable standard for reviewing First Amendment claims of access to administrative proceedings.")—it still would not require the Court to rule against the plaintiffs. *Id.* at 696. That was because deportation proceedings are "quasi-judicial" and thus

23

more like the trials at issue in *Richmond Newspapers* than like the "access to a government facility normally restricted to the public" at issue in *Houchins*. *Id*. And the *Detroit Free Press* opinion—both before that discussion (indeed, in a heading) and afterward—stated that *Richmond Newspapers* provides a test of "general applicability." *Id*. at 694, 699. Thus, the discussion in *Detroit Free Press* distinguishing *Houchins* is an alternative basis for its holding, if not dicta.

Therefore, the district court here erred both in concluding that *Phillips* had effectively overruled *Detroit Free Press* and in concluding that *Phillips* precludes applying the *Richmond Newspapers* test in this case. *Richmond Newspapers* is the proper test here because McCaleb seeks access to a government proceeding, as in *Richmond Newspapers* itself and *Detroit Free Press*, not government information unrelated to any proceeding, as in *Houchins* and *Phillips*.

## II. Under the *Richmond Newspapers* "experience and logic" test, Plaintiff has a First Amendment right to access meetings of Tennessee's Judicial Advisory Commission.

Under the *Richmond Newspapers* test, the First Amendment requires Defendant Long to restore public access to meetings of Tennessee's Judicial Advisory Commission.

24

### A. Tennessee Judicial Advisory Commission meetings satisfy the "experience" prong because there is a tradition of accessibility for this and similar proceedings.

Meetings of Tennessee's Judicial Advisory Commission satisfy the first prong of the *Richmond Newspapers* test, which considers whether a proceeding has historically been open to the public and the media because "a tradition of accessibility implies the favorable judgment of experience." 448 U.S. at 589.

This Court is not rigid or formulaic in determining whether enough time has passed to establish a "tradition" and has noted that "a brief historical tradition might be sufficient to establish a First Amendment right of access where the beneficial effects of access to that process are overwhelming and uncontradicted." *Detroit Free Press*, 303 F.3d at 701. In considering this prong, courts "should look to proceedings that are similar in form and substance." *Id.* at 702. "Substantively, [a court should] look to other proceedings that have the same effect." *Id.* As the Court explained in paraphrasing the Supreme Court, the comparative analysis is a "walk, talk, and squawk" approach." *Id.*

Tennessee has its own tradition of granting public access to the very Advisory Commission at issue in this case, as the meetings were open to

the public until 2018. Michelle Consiglio-Young Deposition, R. 74-3, Page ID ## 2745-56.

And the federal government provides a substantially identical analogue—establishing a tradition of access—in the federal Judicial Conference Committee on Rules of Practice and Procedure and its five Advisory Committees, all of which have long held their meetings open to the public.

Under the Judicial Improvements and Access to Justice Act of 1988, enacted nearly 37 years ago, "[e]ach meeting for the transaction of business under this chapter by any committee appointed under this section shall be open to the public." 28 U.S.C. § 2073(c)(1). As a result, the public has access to meetings of the federal Judicial Conference Committee on Rules of Practice and Procedure ("Standing Committee") and its five Advisory Committees, which "carry on a continuous study of the operation and effect" of the federal rules as directed by the Rules Enabling Act. United States Courts, *How the Rulemaking Process Works*.[5] These Advisory Committees on Criminal, Civil, Bankruptcy,

---

[5] https://www.uscourts.gov/rules-policies/about-rulemaking-process/how-rulemaking-process-works (last visited Mar. 13, 2025).

Appellate, and Evidence Rules meet and evaluate recommendations on proposed amendments to the federal rules of practice and procedure. *Id.*

"Each meeting [of these committees] must be preceded by notice of the time and place, published in the Federal Register and on the judiciary's rulemaking website, sufficiently in advance to permit interested persons to attend." U.S. Courts, *Procedures Governing the Rulemaking Process* § 440.20.30(a).[6] The Standing Committee and each Advisory Committee typically meets twice per year. United States Courts, *Overview for the Bench, Bar, and Public*[7]; Rule 56.01 Statement R. 75, Page ID #2779. Rule Committee meetings are open to the public and held in a hybrid format, with "remote attendance options whenever possible." United States Courts, *Open Meetings and Hearings of the Rules Committee*.[8] Committee meetings are only closed to the public "when the committee—in open session and with a majority present— determines that it is in the public interest to have all or part of the

_____

[6] https://www.uscourts.gov/procedures-governing-rulemaking-process (last visited Mar. 13, 2025).

[7] https://www.uscourts.gov/forms-rules/about-rulemaking-process/how-rulemaking-process-works/overview-bench-bar-and-public (last visited Mar. 13, 2025).

[8] https://www.uscourts.gov/forms-rules/about-rulemaking-process/open-meetings-and-hearings-rules-committee (last visited Mar. 13, 2025).

meeting closed and states the reason." *Procedures Governing the Rulemaking Process* § 440.20.30(a).

Even five years before Congress enacted the statute, in 1983, the Standing Committee instituted a number of internal changes to make records of the rules Committees available to the public, document all changes made by the Committees at various stages of the process, and conduct public hearings on proposed amendments. Peter G. McCabe, *Renewal of the Federal Rulemaking Process*, 44 Am. U. L. Rev. 1655 (1995).[9]

In form, the federal Advisory Committees are highly similar to Tennessee's Advisory Commission, consisting of members of both the bench and bar. Long Deposition, R. 74-2 at Page ID # 2715. And in substance, with respect to the areas of court rules considered, the federal Advisory Committees are also virtually identical to Tennessee's Advisory Commission. For example, both the federal Advisory Committees and Tennessee's Advisory Commission meet to make recommendations on proposed changes to the practice and procedure of criminal, civil, appellate, and evidence rules. The only substantive

---

[9] https://www.uscourts.gov/sites/default/files/mccabearticle_1.pdf.

difference between the two—reflecting the differing powers of the federal and state governments—is that the federal Advisory Committee alone considers bankruptcy rules, and only the Tennessee Advisory Commission makes recommendations on state juvenile rules. *See How the Rulemaking Process Works*; Long Deposition, R. 74-2, Page ID # 2706.

### B. Tennessee Judicial Advisory Commission meetings satisfy the "logic" prong because public access plays a significant positive role in the Commission's functioning.

Tennessee Judicial Advisory Commission meetings also satisfy the *Richmond Newspapers* test's "logic" prong because public access plays a significant positive role in the Advisory Commission's functioning.

Public access serves as a check on the actions of the state judiciary (and the commission that advises it) by assuring citizens that proceedings are conducted fairly and properly. *See Richmond Newspapers*, 448 U.S. at 569. Public and press access are effectively the only means by which the public may know that proceedings are conducted without bias or other impropriety. And this check encourages Advisory Commission members to accord themselves appropriately and to promulgate better court rules and practices.

29

In addition, "openness ensures that the government does its job properly; that it does not make mistakes," or that any mistakes can be "cured at once" when public attention is brought to them. *Detroit Free Press*, 303 F.3d at 704.

Public access to Advisory Commission meetings also helps ensure that "the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982); *see also Detroit Free Press*, 303 F.3d at 704. "[A] major purpose of the [the First Amendment[ was to protect the free discussion of governmental affairs." *Globe Newspaper*, 457 U.S. at 604. Like access to court proceedings, public access to Advisory Commission meetings helps inform the public of the affairs of state government, particularly its judiciary and the state court rulemaking process. And that "[d]irect knowledge of how their government is operating enhances the public's ability to affirm or protest government's efforts." *Detroit Free Press*, 303 F.3d at 705. By contrast, "[w]hen government selectively chooses what information it allows the public to see, it can become a powerful tool for deception." *Id.*

Openness also enhances transparency and increases the public's

perception of integrity and fairness. Thus, access to Advisory Commission meetings, like access to court proceedings, builds public confidence in the judicial system. *Cf. Press-Enterprise Co. v. Superior Court of Cal.*, 464 U.S. 501, 508 (1984).

## C. The government cannot satisfy its burden under strict scrutiny.

Given that the public has a First Amendment right of access under the *Richmond Newspapers* test, the government can justify curtailing access only if it satisfies strict scrutiny: that is, if is shows "'that denial is necessitated by a compelling governmental interest, and in narrowly tailored to serve that interest.'" *Detroit Free Press*, 303 F.3d at 705 (quoting *Globe Newspaper Co.*, 457 U.S. at 606-07). Moreover, the government must articulate the interest it seeks to serve "along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Id.* (quoting *Press-Enterprise,* 478 U.S. at 10).

In its briefing below, the government did not even attempt to satisfy its burden under strict scrutiny. It cited the supposed benefit of encouraging "candor" among commission members, but it did not argue, let alone establish, that this is a compelling interest. Memo. in Support

of Def.'s Motion for Summary Judgment, R. 72, Page ID # 1946; Def.'s Response in Opp. To Plf.'s Motion for Summary Judgment, R. 80, Page ID # 2841. The only evidence in the record on this point consists of conclusory statements. A former Advisory Commission member (serving as the government's expert witness) stated that he "think[s] having confidential meetings brings a certain level of candor to the meetings that is—diminished by having meetings be public" and that "sensitive" issues could come up at meetings that "would affect the openness by which you . . . discuss certain things." Thomas Lang Wiseman Deposition, R. 72-2, Page ID ## 2072, 2093, 2113. He stated that "sensitive" issues could arise because "if you're amending a rule, you're taking an issue with someone's prior work and/or someone's ruling with respect to prior work," but was no more specific than that and cited no actual or even hypothetical examples. *Id.* at Page ID # 2113. Defendant Long, Director of the Tennessee Administrative Office of the Courts, testified, "I think there are times when in order to have a candid discussion of a matter, there is a need to have that discussion below"— but she did not say what those "times" are or how often they occur, and she did not otherwise elaborate. Long Deposition, R. 74-2, Page ID #

2704. Thus there is no evidence that open meetings had actually discouraged candor, that closed meetings had increased candor, or even that the meetings were closed for that purpose (indeed, as discussed below, they were not).

The government also made no attempt to show that complete closure of all meetings is a narrowly tailored means of serving its interest in preserving candor. Thus, it did not explain, for example, why it would not suffice to allow for selective closure of certain meetings (as in the federal system) on occasions when that might be necessary to encourage candor, rather than close all meetings. Long stated that "there are times" when a discussion must be closed to have a "candid discussion"— not that this is necessary at *all* times or even frequently. Long Deposition, R. 74-2, Page ID ## 2704-05.

Moreover, the record does not support the government's suggestion that the state closed the Advisory Commission meetings for the purpose of increasing candor. Long testified that she does not know why the meetings were closed. *Id.* And her office's liaison to the Advisory Commission testified that the Tennessee Supreme Court ordered the meetings closed in response to a 2018 incident in which a member of the

33

public interrupted the proceedings, became verbally (not physically) "combative" about a topic under discussion, and had to be escorted out. Michelle Consiglio-Young Deposition, R. 74-3, Page ID ## 2745-46.

The government has not argued that the prevention of any possibility of such a disruption is a compelling interest. And even if it is a compelling interest, complete closure is not a narrowly tailored means of serving it. The government could entirely eliminate the potential for such a disruption by livestreaming its meetings online—as it did in 2023 while the district court's preliminary injunction was in force, Def.'s Responses to Plf.'s Statement of Material Facts, R. 81, Page ID # 2848—so the public could observe but could not interrupt.

Finally, there is no evidence in the record that the Advisory Commission suffered from any lack of candor or public disruption when it livestreamed its meetings while the preliminary injunction in this case was in effect.

Because the government has not met, and cannot meet, its burden under strict scrutiny, the First Amendment forbids it from denying McCaleb access to Judicial Advisory Commission meetings, and this Court should reverse the district court's decision to the contrary.

## CONCLUSION

This Court should reverse the district court's order granting Defendants' motion for summary judgment and denying McCaleb's motion for summary judgment, and it should remand this case with instructions to enter a permanent injunction ordering that Advisory Commission meetings be open to the public.

Dated: March 13, 2025          Respectfully submitted,

/s/ Jacob Huebert
Jacob Huebert
James McQuaid
LIBERTY JUSTICE CENTER
7500 Rialto Blvd., Suite 1-250
Austin, Texas 78735
Telephone: (512) 481-4400
jhuebert@ljc.org
jmcquaid@ljc.org

*Counsel for Appellant Dan McCaleb*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 6 Cir. R. 32(b) because it contains 6,209 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: March 13, 2025                Respectfully submitted,


/s/ Jacob Huebert
Jacob Huebert
James McQuaid
LIBERTY JUSTICE CENTER
7500 Rialto Blvd., Suite 1-250
Austin, Texas 78735
Telephone: (512) 481-4400
jhuebert@ljc.org
jmcquaid@ljc.org

*Counsel for Appellant Dan McCaleb*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 13, 2025, the foregoing Principal Brief was filed through the Court's Electronic Filing System, which will send notice to all counsel appearing in this matter.

/s/ Jacob Huebert
Jacob Huebert
James McQuaid
LIBERTY JUSTICE CENTER
7500 Rialto Blvd., Suite 1-250
Austin, Texas 78735
Telephone: (512) 481-4400
jhuebert@ljc.org
jmcquaid@ljc.org

*Counsel for Appellant Dan McCaleb*

# ADDENDUM

## Appellant's Designation of Relevant District Court Documents

| Case No. 3:2022-cv-00439 District Court for the Middle District of Tennessee | | | |
|---|---|---|---|
| District Court Record Entry No. | Date | Description | PageID Range |
| 1 | 6/13/22 | Complaint | 1-15 |
| 19 | 6/30/22 | First Amended Complaint | 131-151 |
| 20 | 6/30/22 | Motion for Preliminary Injunction | 152-157 |
| 24 | 7/14/22 | Defendant's Motion to Dismiss Plaintiff's First Amended Complaint | 221-223 |
| 25 | 7/14/22 | Memorandum in Support of Motion to Dismiss | 224-237 |
| 38 | 12/20/22 | Second Notice of Supplemental Authority | 1069-74 |
| 38-1 | 12/20/22 | 12/12 Tenn. Sup. Ct. Order | 1075-77 |
| 38-2 | 12/20/22 | 12/19 Tenn. Sup. Ct. Order | 1078-83 |
| 38-3 | 12/20/22 | 12/19 Tenn. Sup. Ct. Order | 1084-87 |
| 39 | 3/22/23 | Memorandum Opinion | 1088-1101 |
| 40 | 3/22/23 | Order and Preliminary Injunction | Docket Text Only |
| 71 | 12/15/23 | Defendant's Motion for Summary Judgment | 1929-31 |
| 72 | 12/15/23 | Memorandum in Support of Defendant's Motion for Summary Judgment | 1932-49 |
| 74 | 12/15/23 | Plaintiff's Motion for Summary Judgment | 2651-54 |
| 74-1 | 12/15/23 | Deposition of Dan McCaleb | 2655-75 |
| 74-2 | 12/15/23 | Deposition of Michelle Long | 2676-2733 |

| Case No. 3:2022-cv-00439<br>District Court for the Middle District of Tennessee | | | |
|---|---|---|---|
| District Court Record Entry No. | Date | Description | PageID Range |
| 74-3 | 12/15/23 | Deposition of Michelle Consiglio-Young | 2734-65 |
| 75 | 12/15/23 | Rule 56.01 Statement in Support of Plaintiff's Motion for Summary Judgment | 2777-81 |
| 76 | 12/15/23 | Memorandum in Support of Plaintiff's Motion for Summary Judgment | 2782-2812 |
| 80 | 1/05/24 | Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment | 2830-43 |
| 81 | 1/05/24 | Defendant's Responses to Plaintiff's Statement of Material Facts | 2844-49 |
| 83 | 1/12/24 | Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment | 2851-82 |
| 85 | 1/19/24 | [Plaintiff's] Reply to Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment | 2956-65 |
| 86 | 1/25/24 | [Defendant's] Reply in Support of Defendant's Motion for Summary Judgment | 2966-73 |
| 88 | 11/20/24 | Memorandum Opinion | 2975-89 |
| 90 | 11/20/24 | Entry of Judgment | 2991 |
| 91 | 11/20/24 | Notice of Appeal | 2992 |