CASE NO. 24-6043

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DAN MCCALEB,
*Plaintiff-Appellant,*

v.

MICHELLE LONG,
*Defendant-Appellee.*

On Appeal from the United States
District Court for the Middle District of Tennessee (3:22-cv-00439)

---

BRIEF OF AMICI CURIAE OPEN GOVERNMENT ADVOCATES IN
SUPPORT OF PLAINTIFF-APPELLANT

---

Jennifer Safstrom
Vanderbilt Law School
Stanton Foundation First Amendment Clinic
131 21st Ave South
Nashville, TN 37203-1181
Telephone: (615) 322-4964
jennifer.safstrom@vanderbilt.edu

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................... ii

**INTEREST OF AMICI** ........................................................................1

**INTRODUCTION**................................................................................4

**ARGUMENT** .......................................................................................5

  I.    The Logic and Experience Test of the U.S. Supreme Court's *Richmond Newspapers* Holding Applies to the Facts of This Case. ...............................5

    A.  Supreme Court Precedent Demonstrates That the *Richmond Newspapers* Logic and Experience Test Applies to All Government Proceedings Relating to the Function of Justice. .............................................................7

    B.  The Third, Ninth, and Eleventh Circuits' Understanding of the Precedential Authority and Application of *Richmond Newspapers* Hews to the Supreme Court's Understanding of the First Amendment........................................11

    C.  Some Circuits Misapply *Houchins* as a General Rule of Applicability Rather Than a Narrow Exception, Thus Unduly Limiting the Parameters of the First Amendment Public Right of Access. ...........................................................14

  II.   Under the Logic and Experience Test, This Court Should Find a Public Right of Access to Meetings of the Advisory Commission. ...................................17

    A.  Public Access to Meetings of the Advisory Commission Fulfills the Logic Prong of the *Richmond Newspapers* Test. ..................................................18

    B.  Restoring Public Access to the Advisory Commission Meetings Is Warranted Under the Experience Prong of the *Richmond Newspapers* Test. ....................................................................................................21

**CONCLUSION**....................................................................................23

**CERTIFICATE OF COMPLIANCE** ...............................................24

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Mississippi*,
   911 F.2d 1066 (5th Cir. 1990) .................................................. 14, 15

*Branzburg v. Hayes*,
   408 U.S. 665 (1972) ............................................................. 8

*Cal. First Amend. Coal. v. Woodford*,
   299 F.3d 868 (9th Cir. 2002) ............................................. 12, 13, 16

*Calder v. IRS*,
   890 F.2d 781 (5th Cir. 1989) ............................................... 14

*Courthouse News Serv. v. Planet*,
   750 F.3d 776 (9th Cir. 2014) ............................................... 13

*Ctr. for Nat. Sec. Stud. v. DOJ*,
   331 F.3d 918 (D.C. Cir. 2004) ........................................... 14, 15

*Detroit Free Press v. Ashcroft*,
   303 F.3d 681 (6th Cir. 2002) ............................................. 6, 22

*El Dia, Inc. v. Hernandez Colon*,
   963 F.2d 488 (1st Cir. 1992) ............................................ 14, 15

*Fusaro v. Cogan*,
   930 F.3d 241 (4th Cir. 2019) ........................................... 14, 15

*Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*,
   457 U.S. 596 (1982) ...................................................... 6, 10, 12

*Grosjean v. Am. Press Co.*,
   297 U.S. 233 (1936) ........................................................... 9

*Houchins v. KQED, Inc.*,
   438 U.S. 1 (1978) ..................................... 6, 7, 8, 9, 14, 15, 16, 17

*Index Newspapers LLC v. U.S. Marshals Serv.*,
   977 F.3d 817 (9th Cir. 2020) ............................................ 12, 13

*In re Search of Fair Fin.*,
  692 F.3d 424 (6th Cir. 2012) ................................................................ 6

*Lanphere & Urbaniak v. Colorado*,
  21 F.3d 1508 (10th Cir. 1994) ................................................... 14, 15

*Leigh v. Salazar*,
  677 F.3d 892 (9th Cir. 2012) ......................................................... 13

*N.J. Media Grp., Inc. v. Ashcroft*,
  308 F.3d 198 (3d Cir. 2002) ................................................. 6, 11 - 12

*PG Publ'g Co. v. Aichele*,
  705 F.3d 91 (3d Cir. 2013) ..................................................... 7, 12, 21

*Phillips v. DeWine*,
  841 F.3d 405 (6th Cir. 2016) ......................................... 6, 15, 16, 17

*Press-Enter. Co. v. Superior Ct. of Cal., Riverside Cnty.*,
  464 U.S. 501 (1984) ...................................................................... 5, 10

*Press-Enter. Co. v. Superior Ct. of Cal. for the Cnty. of Riverside*,
  478 U.S. 1 (1986) .............................................. 5, 7, 11, 14, 17, 21

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) ............ 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 21, 22

*Stromberg v. California*,
  283 U.S. 359 (1931) ................................................................... 9 - 10

*Travis v. Reno*,
  163 F.3d 1000 (7th Cir. 1998) ................................................... 14, 15

*United States v. Smith*,
  787 F.2d 111 (3d Cir. 1986) ..................................................... 18, 19

*Wellons v. Comm'r, Ga. Dep't of Corr.*,
  754 F.3d 1260 (11th Cir. 2014) ................................................ 12, 13

*Whiteland Woods, L.P. v. Twp. of W. Whiteland*,
  193 F. 3d 177 (3rd Cir. 1999) ........................................................ 12

**Other**

*Halijan Appointed by Tennessee Supreme Court to Second Term on Rules Advisory Commission*, Burch, Porter & Johnson PLLC (Jan. 31, 2020), https://www.bpjlaw.com/2020/01/31/halijan-appointed-by-tennessee-supreme-court-to-second-term-on-rules-advisory-commission/......................................20

Jon Styf, *Tennessee Court Advisory Commission Holds Open Meeting Due to Injunction*, Ctr. Square (Dec. 8, 2023), https://www.thecentersquare.com/tennessee/article_bc83354e-9606-11ee-8610-e736495e8caf.html ...................................................................20

*Records of the Judicial Committee of the Privy Council*, Nat'l Archives, https://discovery.nationalarchives.gov.uk/browse/r/h/C224 (last visited Mar. 20, 2025) ................................................................................................20

*Sims Appointed to Second Three-Year Term on the Tennessee Advisory Commission*, Sims Funk (Aug. 6, 2024), https://simsfunk.com/news/w-scott-sims-has-been-appointed-by-the-tennessee-supreme-court-to-serve-a-second-three-year-term-on-the-tennessee-advisory-commission-on-the-rules-of-practice-and-procedure/ .................................................................20

*Tennessee Court Advisory Commission to Hold Open Meetings Due to Injunction*, Liberty Just. Ctr. (Nov. 28, 2023), https://libertyjusticecenter.org/newsroom/tennessee-court-advisory-commission-to-hold-open-meeting-due-to-injuction/ ........................................19

*The History of the JCPC*, Jud. Comm. of the Privy Council, https://jcpc.uk/history-of-jcoc (last visited Mar. 20, 2025) ...................................................22

TNCourts 2, *Advisory Commission on the Rules of Practice & Procedure*, YouTube (June 9, 2023), https://www.youtube.com/watch?v=TCCkGHybsxg ........................................................................................ 19, 20 - 21

TNCourts 2, *December Rules Commission Meeting*, YouTube (Dec. 8, 2023), https://www.youtube.com/watch?v=XHY3DFF3V2E&t=9s ..........................21

## INTEREST OF AMICI

Amici are entities devoted to First Amendment advocacy and thus have an interest in open meetings, judicial operations, and government transparency. These issues are implicated by Tennessee's closure of the meetings of the Advisory Commission on the Rules of Practice & Procedure.

The **American Civil Liberties Union of Tennessee** ("ACLU-TN") is a nonprofit, nonpartisan membership organization devoted to protecting the civil rights and civil liberties of all Americans, including the First Amendment right of public access to governmental meetings. ACLU-TN regularly appears in First Amendment cases, both as counsel and amicus, including in this Court. *See, e.g.*, *Diei v. Boyd*, 116 F.4th 637 (6th Cir. 2024).

The **Authors Guild** is a national nonprofit association of over 15,000 professional writers of all genres. Its members include leading historians, biographers, academicians, journalists, and other writers of nonfiction and fiction whose works have appeared in the most influential and well-respected publications in every field. The Guild has a fundamental interest in ensuring that works of authorship and the rights of authors are protected, and that the hard work and talents of American authors are rewarded so that they can keep writing, as intended by the framers of the United States Constitution. The Guild believes that it is crucial for our

culture and the future of democracy to ensure that our literature and arts remain vibrant and diverse.

The **Electronic Frontier Foundation** ("EFF") is a member-supported, nonprofit civil liberties organization that works to protect free speech and privacy in the digital world. Founded in 1990, EFF has over 39,000 members. EFF advocates for internet users' privacy and frequently seeks access to public records reflecting law enforcement surveillance by litigating Freedom of Information Act ("FOIA") requests and petitioning state and federal courts to unseal judicial records. *See, e.g.*, *Elec. Frontier Found. v. DOJ*, 384 F. Supp. 3d 1 (D.D.C. 2019) (seeking records regarding FBI's informant program for Best Buy computer repair employees); *Elec. Frontier Found., Inc. v. Superior Ct.*, 83 Cal. App. 5th 407 (2022) (seeking to unseal search warrant affidavits reflecting law enforcement's use of cell-site simulators). EFF has also served as counsel to parties seeking to unseal court records. *See In re Petition of Index Newspapers LLC d/b/a The Stranger*, No. 17-mc-00145 (W.D. Wash. Nov. 15, 2017) (seeking access to sealed electronic surveillance dockets, applications, and court orders).

The **Foundation for Individual Rights and Expression** ("FIRE") is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. In lawsuits across the United States, FIRE works to vindicate First Amendment rights without regard to speakers' views. *See,*

*e.g.*, *Trump v. Selzer*, No. 4:24-cv-449 (S.D. Iowa filed Dec. 16, 2024); *Volokh v. James*, 656 F. Supp. 3d 431 (S.D.N.Y. 2023), *appeal pending*, No. 23-356 (2d Cir. argued Feb. 16, 2024); *Pernell v. Fla. Bd. of Governors of the State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022), *appeal pending sub nom*. *Novoa v. Diaz*, No. 22-13994 (11th Cir. argued June 14, 2024).

The **Reporters Committee for Freedom of the Press** ("Reporter's Committee") is an unincorporated nonprofit association founded by journalists and media lawyers in 1970. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists. The Reporters Committee employs a Tennessee-based attorney to provide direct legal services, including on right of access matters, to journalists and news organizations in the state.

The **Tennessee Coalition for Open Government** ("TCOG") is a Tennessee-based advocacy group that seeks to preserve, protect, and improve citizen access to public information and open government in Tennessee through an alliance of citizens, journalists, and civic groups. TCOG's mission rests on the belief that access to government information, through public records and public meetings, is crucial in allowing informed citizen participation in a democratic society.

## INTRODUCTION

The First Amendment protects the right of the public to communicate about the function of their government. As a result, the First Amendment also protects a robust right of public access to government operations, including criminal trials, civil proceedings, and, most relevantly here, other operations of the judicial branch. The Tennessee Administrative Office of the Courts' abrupt determination to prohibit public access to the Advisory Commission on the Rules of Practice & Procedure ("Advisory Commission"), which proposes changes to the rules of practice and procedure in the Tennessee state court system, violates these principles. The closure of these meetings, which have been historically open to the public, is a clear violation of Appellant's—and the public's—First Amendment rights under the Supreme Court's logic and experience test as expounded in *Richmond Newspapers* and its progeny. Continuing public access to long-open aspects of the justice system is a bedrock of our constitutional republic that ensures accountability and public trust in the legitimacy of our institutions. To deny public access would betray the promise of free speech that has been handed down since the Founding. Thus, the Administrative Office of the Courts' closure of the Advisory Commission meetings violates the Constitution, and this Court should find that the First Amendment requires public access.

## ARGUMENT

**I.    The Logic and Experience Test of the U.S. Supreme Court's *Richmond Newspapers* Holding Applies to the Facts of This Case.**

The "core purpose" of a public right of access is to promote "freedom of communication on matters *relating to the functioning of government*." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980) (plurality opinion) (emphasis added). In particular, the core purpose is to "provide[] protection to all members of the public from abridgment of their rights of access to information about the operation of their government, including the Judicial Branch." *Id.* at 584 (Stevens, J., concurring); *see also Press-Enter. Co. v. Superior Ct. of Cal., Riverside Cnty.*, 464 U.S. 501, 517 (1984) (hereinafter "*Press-Enterprise I*") (Stevens, J., concurring) (citing *Richmond Newspapers*, 448 U.S. at 589).

In its line of cases on the public's right of access to government operations, the U.S. Supreme Court has consistently upheld a public right of access to government operations that the public has historically experienced as open and that logically should be kept open. *Press-Enter. Co. v. Superior Ct. of Cal. for the Cnty. of Riverside*, 478 U.S. 1, 8 (1986) (hereinafter "*Press-Enterprise II*"). To preserve the First Amendment principle that the public should know what the government is doing in matters that directly affect the public, proceedings that meet the logic and experience test must remain open and accessible to the public unless there is an

5

opposite compelling government interest. *Id.* at 9 (citing *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 606 (1982)).

Despite the Supreme Court's clear statement regarding public access, a split has developed amongst the federal courts of appeals. While some courts apply *Richmond Newspapers* as their general public access rule, others apply a stricter public access rule derived from *Houchins v. KQED, Inc.*, 438 U.S. 1, 3 (1978)—a pre-*Richmond Newspapers* case finding that the plaintiffs did not have a right of access to a restricted area of a prison under the First Amendment. *See N.J. Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 201 (3d Cir. 2002). For its part, the Sixth Circuit has applied *Richmond Newspapers* in a range of public access matters. *See Detroit Free Press v. Ashcroft*, 303 F.3d 681, 694 (6th Cir. 2002) (finding *Richmond Newspapers* granted a public right of access to "administrative proceedings that exhibit substantial quasi-judicial characteristics"); *In re Search of Fair Fin.*, 692 F.3d 424, 427 (6th Cir. 2012) (applying *Richmond Newspapers* to documents relating to "search warrant proceedings"). *But see Phillips v. DeWine*, 841 F.3d 405, 419 (6th Cir. 2016) (claiming *Houchins* is the general rule in a case that did not implicate access to a proceeding). Thus, amici urge the Sixth Circuit to protect the First Amendment right of access and apply the Supreme Court's logic and experience test as set forth in *Richmond Newspapers* in the present case.

### A. Supreme Court Precedent Demonstrates That the *Richmond Newspapers* Logic and Experience Test Applies to All Government Proceedings Relating to the Function of Justice.

In *Press-Enterprise II*, the Supreme Court considered the "First Amendment right of access" to "preliminary hearings in criminal trials." 478 U.S. at 4. The Court held that a right of First Amendment access requires a two-prong evaluation of "whether the place and process have historically been open to the press" and "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* at 8. When both prongs of the test are satisfied, as they were in *Press-Enterprise II*, "a qualified First Amendment right of public access attaches." *Id.* at 9; *see also PG Publ'g Co. v. Aichele*, 705 F.3d 91, 104 (3d Cir. 2013) (applying *Richmond Newspapers* to assess public access to polling places).

*Press-Enterprise II* was the culmination of almost a decade of Supreme Court development of the First Amendment right of access to government operations. The first entry in this line of precedent was *Houchins*, a case involving a media company's attempt to gain access "over and above that of other persons" to secured sections of a prison. 438 U.S. at 3. In *Houchins*, a three-justice plurality found that the First and Fourteenth Amendments did not "mandate" a right of access to all government information and that "the media have no special right of access to the Alameda County Jail different from or greater than that accorded the public generally." *Id.* at 16. Three justices dissented, arguing that the facts of the case were

7

egregious and writing that "Petitioner's no-access policy . . . could survive constitutional scrutiny only if the Constitution affords no protection to the public's right to be informed about conditions within those public institutions where some of its members are confined because they have been charged with or found guilty of criminal offenses." *Id.* at 30 (Stevens, J., dissenting).

Two years later, the Supreme Court reversed course. In *Richmond Newspapers*, a local publication sued Virginia after a trial judge overseeing a man's fourth murder trial closed the proceedings to the public entirely. 448 U.S. at 559. The three-justice plurality found that "fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Id.* at 556–57. The public's right to attend criminal trials is "implicit in the guarantees of the First Amendment; without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and 'of the press could be eviscerated.'" *Id.* (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972)). Justice Stevens, a member of the plurality, wrote separately to praise the Court's departure from *Houchins* as necessary to fully implement the First Amendment. *See id.* at 581–84 (Stevens J., concurring). Justice Stewart's concurrence included a broad articulation of the First Amendment right of public access to government operations: "[T]he First and Fourteenth Amendments clearly give the press and the public a right of access to trials themselves, civil as

8

well as criminal. . . . [I]t has for centuries been a basic presupposition of the Anglo-American legal system that trials shall be public trials." *Id.* at 599 (Stewart J., concurring).

Justices Brennan and Marshall concurred in judgment as well, and it is from their concurrence that the Court has drawn its access test. Much like Justice Stevens, they took an expansive view of the right of public access: "Read with care and in context, our decisions" in *Houchins* and *Richmond Newspapers* "must be understood as holding only that any privilege of access to governmental information is subject to a degree of restraint dictated by the nature of the information and countervailing interests in security or confidentiality." *Richmond Newspapers*, 448 U.S. at 586 (Brennan, J., concurring). These restrictions are so limited because "the First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a *structural* role to play in securing and fostering our republican system of self-government." *Id.* at 587 (emphasis in original); *see Grosjean v. Am. Press Co.*, 297 U.S. 233, 249–50 (1936) (reasoning that the First Amendment exists to protect the public from "any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens"); *see also Stromberg v. California*, 283 U.S. 359, 369 (1931) (reasoning that the expansiveness of the First Amendment stems from

the Founders' understanding that "the maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means . . . is a fundamental principle of our constitutional system"). In Justices Brennan and Marshall's view, the First Amendment access right applies to judicial processes because it protects the "process of communication necessary for a democracy to survive, and thus entails solicitude not only for communication itself, but also for the indispensable conditions of meaningful communication." *Richmond Newspapers*, 448 U.S. at 588. The case for a right of access is thus particularly potent "when drawn from an enduring and vital tradition of public entree to particular proceedings or information." *Id.* at 589.

Two years later, in *Globe Newspaper Co.*, the Supreme Court followed its robust defense of the First Amendment access right. 457 U.S. at 610. In reaffirming its commitment to *Richmond Newspapers*, the Court held that the public has a right to access judicial functions in accord with logic and experience stemming from the public's right to discuss and challenge governmental actions. *Id*. Then, two years later in *Press-Enterprise I*, the Court affirmed that the logic and experience test presumptively applied to all judicial functions, not merely trials, finding a First Amendment access right to jury selection. 464 U.S. at 505.

*Press-Enterprise II* emphasized the expansiveness of *Richmond Newspapers* further, finding that logic and experience dictated public access to preliminary hearings because access "plays a particularly significant positive role in the actual functioning of the process." *Press-Enterprise II*, 478 U.S. at 11. "People in an open society," the Court concluded, "do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Id.* at 13 (citing *Richmond Newspapers*, 448 U.S. at 572). In considering the implications of public access to the judicial system, the Court highlighted:

> The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.

*Id.* This value applies to everything touching the justice system. *See Richmond Newspapers*, 448 U.S. at 599.

### B. The Third, Ninth, and Eleventh Circuits' Understanding of the Precedential Authority and Application of *Richmond Newspapers* Hews to the Supreme Court's Understanding of the First Amendment.

The Third, Ninth, and Eleventh Circuits have consistently held that the *Richmond Newspapers* test is the generally applicable rule for any closed government proceeding related to the function of justice. *See, e.g.*, *N.J. Media Grp.*,

*Inc.*, 308 F.3d at 201 (finding this test granted a right of access "special interest" deportation hearings); *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 830 n.8 (9th Cir. 2020) (assessing the public's right of access at a courthouse during protests); *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1266 (11th Cir. 2014) (applying the test to execution protocols).

In *PG Publishing Co.*, the Third Circuit reviewed its precedent on the constitutional right of access, which extends "beyond litigation proceedings" to a variety of "nonpublic fora." 705 F.3d at 105. Importantly, these fora include city planning commission meetings, "the process of voting," and all "government proceedings under Articles I and II of the Constitution." *Id.* at 106–07; *see also Whiteland Woods, L.P. v. Twp. of W. Whiteland,* 193 F.3d 177, 180 (3d Cir. 1999) (finding public access to municipal meetings). The inclusion of these governmental activities represents a natural expansion of the Supreme Court's implied right of access to judicial proceedings. *See PG Publ'g Co.*, 705 F.3d at 106–07.

Similarly, the Ninth Circuit describes the public's "qualified right of access to governmental proceedings" as "well-settled," premised on "the common understanding that 'a major purpose of the First Amendment was to protect the free discussion of governmental affairs.'" *Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 873–74 (9th Cir. 2002) (quoting *Globe Newspaper*, 457 U.S. at 604). Under the *Richmond Newspapers* test, the Ninth Circuit has recognized a general, public right

of access in a wide variety of settings, including executions, government responses to protests, civil documents, and public land management by government officials. *See, e.g.*, *Cal. First Amend. Coal.*, 299 F.3d at 873 (executions); *Index Newspapers LLC*, 977 F.3d at 830 (protests at a courthouse); *Courthouse News Serv. v. Planet*, 750 F.3d 776, 787–89 (9th Cir. 2014) (civil documents); *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012) (land management). A First Amendment public right of access attaches to these governmental operations because the public has long accessed them and, without this access, the functioning of the operations would be negatively impacted.

The Eleventh Circuit applies a broad understanding of the *Richmond Newspapers* test similar to the Ninth Circuit. In *Wellons*, the court found against the plaintiff, a prisoner attempting to gain access to information about his impending execution, applying the "two complementary considerations" of *Richmond Newspapers*. *Wellons*, 754 F.3d at 1266. First, a court considers "whether the place and process have historically been open to the press and general public;" second, "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* These circuits' understanding of *Richmond Newspapers* and the First Amendment correctly reflects the Supreme Court's right-of-access precedent.

13

### C. Some Circuits Misapply *Houchins* as a General Rule of Applicability Rather Than a Narrow Exception, Thus Unduly Limiting the Parameters of the First Amendment Public Right of Access.

*Richmond Newspapers* provides the rule of general applicability for public access. This right of access is "qualified," and *Houchins* is best understood as filling the gap in the *Richmond Newspapers* right of access test. *See Press-Enterprise II*, 478 U.S at 9. *Houchins* narrows the scope of the First Amendment right of public access, but only in limited circumstances, such as when privacy or security concerns are at issue. The district court opinion in the instant matter cites a number of cases where *Houchins* was applied as the general rule—these cases, however, are rightly read as falling into the *Houchins* exception to the general *Richmond Newspapers* test. *See, e.g.*, *El Dia, Inc. v. Hernandez Colon*, 963 F.2d 488, 495 (1st Cir. 1992) (relating to privacy interests in travel expenses); *Fusaro v. Cogan*, 930 F.3d 241, 250 (4th Cir. 2019) (concerning privacy interests in out-of-state voter rolls); *ACLU v. Mississippi*, 911 F.2d 1066, 1071 (5th Cir. 1990) (pertaining to security concerns for those implicated in segregation files); *Calder v. IRS*, 890 F.2d 781, 783 (5th Cir. 1989) (relating to privacy interests in personal tax returns); *Travis v. Reno*, 163 F.3d 1000, 1007 (7th Cir. 1998) (concerning privacy interests in drivers' records); *Lanphere & Urbaniak v. Colorado*, 21 F.3d 1508, 1511 (10th Cir. 1994) (regarding commercialization of personal criminal records); *Ctr. for Nat. Sec. Stud. v. DOJ*, 331

F.3d 918, 935 (D.C. Cir. 2004) (relating to information about national security measures).

In these cases, denial of a right of access was justified in order to promote safety, protect reasonable assumptions of privacy, and mitigate security concerns. Further, these cases all dealt with records or information, rather than judicial proceedings. In *ACLU v. Mississippi*, for instance, finding a right of access to information about state segregation efforts would have almost undoubtedly been a death sentence for members of a private desegregation group in the Jim Crow South. 911 F.2d at 1073. The court in *Fusaro* held that the First Amendment did not protect a right to unfettered access to Maryland's voter rolls because such access might chill Marylanders' participation in the political process. 930 F.3d at 250. In the D.C. Circuit cases that the district court relied on, post-9/11 national security concerns required that the public not have access to the classified materials the plaintiffs sought. *See Ctr. for Nat'l Sec. Stud.*, 331 F.3d at 935.

The courts in *El Dia*, *Fusaro*, *Lanphere & Urbaniak*, and *Travis* used *Houchins* to find that the First Amendment did not grant a public right of access to records, as in *Phillips*, where the law had explicitly barred the requested records from public access. *Phillips*, 841 F.3d at 414. The district court's reliance on *Phillips* in support of its holding failed to recognize the case's limited scope and

applicability.[1] *Phillips* is a case about access to state public records and information known by the state, not access to governmental proceedings. *Id.* at 418 (leading the substantive discussion with an explanation that *Houchins*' plurality opinion "sets the baseline principle for First Amendment claims *seeking access to information held by the government*") (emphasis added) (citation omitted); *see also id.* at 410 (explaining that the case was a "challenge [to] the constitutionality of [Ohio's] newly enacted statutory scheme concerning the confidentiality of *information* related to lethal injection") (emphasis added).

This conclusion is made plain by *Phillips*' discussion of the Ninth Circuit's decision in *California First Amendment Coalition v. Woodford*, 299 F.3d at 877. *See Phillips*, 841 F.3d at 419. The *Phillips* Court emphasized that it was "neither adopt[ing] nor reject[ing] the Ninth Circuit's position in [*Woodford*] that the public has a right of access to executions under *Richmond Newspapers*" and that "[w]e need not resolve that question today." *Id.* "While the public's right of access under the First Amendment covers certain records filed in and transcripts of a qualifying governmental proceeding, . . . it does not follow that this right covers *all* information related to the proceeding." *Id.* (emphasis in original) (internal citation omitted). In that limited circumstance, *Houchins* may apply, but here, Appellant seeks access to

---

[1] The district court erroneously referred to the *Phillips* decision as an *en banc* decision. 841 F.3d at 405 (rehearing e*n banc* denied February 3, 2017).

a governmental proceeding, not information related to that governmental proceeding. *Phillips* is inapposite. Thus, while *Richmond Newspapers* and *Houchins* coexist, the Sixth Circuit's application of *Houchins* in *Phillips* does not apply to the facts of this case given that the Advisory Commission meetings are proceedings.

**II.      Under the Logic and Experience Test, This Court Should Find a Public Right of Access to Meetings of the Advisory Commission.**

Under the *Richmond Newspapers* logic and experience test, the closure of meetings of the Advisory Commission on the Rules of Practice & Procedure to public access is unconstitutional. A judicial function fulfills the logic prong of the two-part *Richmond Newspapers* test when public access plays a "significant positive role in the actual functioning" of that government action, *Press-Enterprise II*, 478 U.S. at 11, and in our "system of self-government" as a whole, *Richmond Newspapers*, 448 U.S. at 587. Public access to the Advisory Commission meetings is crucial to their "actual functioning" because public trust in the judicial system flows from the ability to observe the process by which rules are promulgated. *See Press-Enterprise II*, 478 U.S. at 11.

The Advisory Commission meetings satisfy the experience prong because the claim to public access is "drawn from an enduring and vital tradition of public entree" to that function. *Richmond Newspapers*, 448 U.S. at 589 (Brennan, J., concurring). The public has long experienced open access to the Advisory Commission's meetings, and logic requires that proceedings of this judicial nature be open in

accordance with First Amendment principles. Therefore, amici urge this Court to apply the *Richmond Newspapers* logic and experience test and require the Tennessee Administrative Office of the Courts to hold the Advisory Commission meetings open to the public.

### A. Public Access to Meetings of the Advisory Commission Fulfills the Logic Prong of the *Richmond Newspapers* Test.

Under the *Richmond Newspapers* logic and experience test, the closure of meetings of the Advisory Commission on the Rules of Practice & Procedure is unconstitutional. The *Richmond Newspapers* Court distilled "six societal interests" that court proceedings promote, all of which are furthered by access to Advisory Committee meetings. *United States v. Smith*, 787 F.2d 111, 114 (3d Cir. 1986) (summarizing *Richmond Newspapers*, 448 U.S. at 569–71, 572, 584, 595–96).

First, keeping meetings of the Advisory Commission open will promote "informed discussion of governmental affairs" and "provid[e] the public with [a] more complete understanding of the judicial system." *Id*. Because these meetings consider questions that can have immense impacts—for example, setting filing deadlines, which can see cases otherwise substantively meritorious thrown out, and requirements for attorneys previously sanctioned for misconduct to represent clients—public access to the discussions that create the Rules "likely creates better rules." [*See* Doc. 39.]

Second, public access promotes "the public perception of fairness which can be achieved only by permitting full public view of the proceedings." *Smith*, 787 F.2d at 114. This sense of equity is enhanced by transparency surrounding the debate and discussion at these meetings, which allows differing viewpoints and perspectives to surface. *See* TNCourts 2, *Advisory Commission on the Rules of Practice & Procedure*, YouTube (June 9, 2023), https://www.youtube.com/watch?v=TCCkGHybsxg (debating how to implement and explain electronic filing requirements).

Third, these meetings provide "a significant community therapeutic value as an outlet for community concern." *Smith*, 787 F.2d at 114. Fourth, access "serv[es] as a check on corrupt practices." *Id.* The Advisory Commission meetings satisfy both of these interests in the same way that any other judicial proceeding does: community members have enjoyed a public right of access to these meetings that discuss issues of public concern [Doc. 17], and it will always be easier to stem corruption when that corruption has nowhere to hide.

Fifth, public access "enhance[s] the performance of all involved." *Smith*, 787 F.2d at 114. The Commission has been the subject of extensive reporting that has focused on how the meetings affect the public and who the members of the Commission are. *See, e.g.*, *Tennessee Court Advisory Commission to Hold Open Meetings Due to Injunction*, Liberty Just. Ctr. (Nov. 28, 2023),

19

https://libertyjusticecenter.org/newsroom/tennessee-court-advisory-commission-to-hold-open-meeting-due-to-injunction/; Jon Styf, *Tennessee Court Advisory Commission Holds Open Meeting Due to Injunction*, Ctr. Square (Dec. 8, 2023), https://www.thecentersquare.com/tennessee/article_bc83354e-9606-11ee-8610-e736495e8caf.html; *Halijan Appointed by Tennessee Supreme Court to Second Term on Rules Advisory Commissio*n, Burch, Porter & Johnson PLLC (Jan. 31, 2020), https://www.bpjlaw.com/2020/01/31/halijan-appointed-by-tennessee-supreme-court-to-second-term-on-rules-advisory-commission/; *Sims Appointed to Second Three-Year Term on the Tennessee Advisory Commission*, Sims Funk (Aug. 6, 2024), https://simsfunk.com/news/w-scott-sims-has-been-appointed-by-the-tennessee-supreme-court-to-serve-a-second-three-year-term-on-the-tennessee-advisory-commission-on-the-rules-of-practice-and-procedure/.

Furthermore, "there are no potential harms from opening" the Advisory Commission meetings. [Doc. 17.] No confidential personal or national security information is revealed at the meetings. Rather, a sample of the meetings, made available by the district court's preliminary injunction, reveals that the main substantive act of the Advisory Commission in meetings is to consider proposed amendments and comments to sections of the Tennessee Rules of Civil, Criminal, and Appellate Procedure, with guidance from outside attorneys, and take votes on whether to approve these amendments for the Tennessee Supreme Court. *See*

TNCourts 2, *Advisory Commission on the Rules of Practice & Procedure*, YouTube (June 9, 2023), https://www.youtube.com/watch?v=TCCkGHybsxg (discussing potential new rules and amendments); TNCourts 2, *December Rules Commission Meeting*, YouTube (Dec. 8, 2023), https://www.youtube.com/watch?v=XHY3DFF3V2E&t=9s (same). The functioning of these meetings, like those of other judicial functions and nonbinding planning meetings, benefits from openness and is in no way harmed by transparency. *See Press-Enterprise II*, 478 U.S. at 9. Thus, this judicial process of proposal, consideration, and refinement logically should be open to the public under *Richmond Newspapers*.

> **B. Restoring Public Access to the Advisory Commission Meetings Is Warranted Under the Experience Prong of the *Richmond Newspapers* Test.**

"The government may not close [] proceedings which historically have been open except where public access contributes nothing of significant value to that process or where there is a compelling state interest in closure and a carefully tailored resolution of the conflict between that interest and First Amendment concerns." *PG Publ'g Co.*, 705 F.3d at 105. The Advisory Commission meetings have historically been open to the public. [Doc. 76, at 4–5.] Tellingly, the progenitors of these meetings—the meetings of the U.S. Advisory Committees on Civil, Appellate, Criminal, and other rules—are all open to the public and have been for

over forty years, even before being required to do so by federal statute. *Id.*; [Doc. 39, at 10]. The English common law precursor to court rules committees, the Judicial Committee of Privy Council, has existed in various forms since the Norman Conquest, and its records have been public dating to the 1700s. *See The History of the JCPC*, Jud. Comm. of the Privy Council, https://jcpc.uk/history-of-jcpc (last visited Mar. 20, 2025); *see also Records of the Judicial Committee of the Privy Council*, Nat'l Archives, https://discovery.nationalarchives.gov.uk/browse/r/h/C224 (last visited Mar. 20, 2025).

This history is analogous to the finding that the public had an experience of access in *Detroit Free Press*, where this Circuit held that thirty-seven years was a sufficient amount of time to create a *Richmond Newspapers* "experience" or "tradition" of openness, and that shorter periods would be acceptable under sufficiently compelling logical reasons. *Detroit Free Press*, 303 F.3d at 701; *see* [Doc. 39]. The U.S. Advisory Committee meetings have been open thirty-four years—a similar amount of time to that in *Detroit Free Press* and sufficient to inspire numerous articles on their openness. [Doc. 17.] This public discussion about their openness represents a "widespread acknowledgment" that the public not only understands the importance of these and similar meetings but has a genuine "experience" of access fulfilling the *Richmond Newspapers* test. *Detroit Free Press*, 303 F.3d at 701; *see Richmond Newspapers*, 448 U.S. at 570–71.

22

Thus, meetings of the Advisory Commission fulfill both prongs of the logic and experience test, and the public has a First Amendment right to access them.

## CONCLUSION

For the reasons discussed above, this Court should find that the First Amendment public right of access applies to the meetings of the Tennessee Advisory Commission on the Rules of Practice & Procedure. Non-confidential judicial functions, such as those of the Advisory Commission, should be open to promote public conversations about the judicial system, trust in the justice system, and the very functioning of our courts themselves. In a country founded on civic participation, it is impossible to ask the people to accept being excluded from the rooms where rules that will affect their lives are made.

Dated: March 20, 2025          Respectfully submitted,

Jennifer Safstrom
Vanderbilt Law School
Stanton Foundation First Amendment Clinic
131 21st Ave South
Nashville, TN 37203-1181
Telephone: (615) 322-4964
jennifer.safstrom@vanderbilt.edu

*Mary Hernandez and Ryan Riedmueller substantially assisted with the development of this brief

*Counsel for Amici Curiae*

23

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 4,389 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, Times New Roman, in 14-point font using Microsoft Word.

Dated: March 20, 2025                         Respectfully submitted,

                                              /s/ Jennifer Safstrom
                                              Jennifer Safstrom
                                              Stanton    Foundation    First
                                              Amendment Clinic
                                              Vanderbilt Law School

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 20, 2025, an electronic copy of this brief was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system and that service of the brief will be accomplished by the electronic filing system.


Dated: March 20, 2025                              Respectfully submitted,

                                                   /s/ Jennifer Safstrom
                                                   Jennifer Safstrom
                                                   Stanton    Foundation    First
                                                   Amendment Clinic
                                                   Vanderbilt Law School